IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Kelly Burnett, | ) | C/A No.: 2:16-1637-MGL-MBG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill,[1] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two
issues before the court are whether the Commissioner's findings of fact are supported by
substantial evidence and whether she applied the proper legal standards. For the reasons
that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

A.      Procedural History

On December 29, 2010, Plaintiff protectively filed an application for SSI in which
she alleged her disability began on June 20, 2008. Tr. at 183 and 301–09. Her application

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant
to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as
the defendant in this lawsuit.

was denied initially and upon reconsideration. Tr. at 235–38 and 239–40. Plaintiff had a hearing before Administrative Law Judge ("ALJ") Gregory M. Wilson on February 9, 2015.[2] Tr. at 143–81 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 20, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 20–48. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 21, 2016. [ECF No. 1].

### B.   Plaintiff's Background and Medical History

#### 1.   Background

Plaintiff was 36 years old at the time of the most recent hearing. Tr. at 149. She completed the eighth grade. Tr. at 85. She has no past relevant work ("PRW"). Tr. at 110. She alleges she has been unable to work since June 20, 2008. Tr. at 301.

#### 2.   Medical History

On January 9, 2009, Plaintiff reported depressed mood, decreased sleep, poor appetite, and suicidal ideation. Tr. at 548. She indicated she had been arguing with her husband over infidelity issues. *Id.* She stated that she had been out of Citalopram for two

---

[2] Plaintiff had a hearing before ALJ George J. Spidel on October 18, 2012 (Tr. at 80–113), that resulted in an unfavorable decision on October 18, 2012 (Tr. at 186–202). The Appeals Council remanded the case on March 21, 2013. Tr. at 203–06. Plaintiff had a second hearing before ALJ Ann G. Paschall on August 28, 2013 (Tr. at 114–42), that resulted in a second unfavorable decision on December 3, 2013 (Tr. at 207–28). On September 16, 2014, the Appeals Council remanded the case for a second time and instructed the ALJ to further evaluate Plaintiff's mental impairments in accordance with the special technique described in 20 C.F.R. § 416.920a; to give further consideration to her maximum RFC during the entire period at issue; and to obtain testimony from a vocational expert, if necessary. Tr. at 229–33.

weeks. *Id.* Doralyn Jones, D.O. ("Dr. Jones"), observed that Plaintiff had a depressed affect. Tr. at 550. She referred Plaintiff for counseling and refilled her prescription for Citalopram. *Id.*

Plaintiff followed up with Dr. Jones on May 5, 2009. Tr. at 544. She indicated a physician in the emergency room ("ER") had prescribed Hydroxyzine and that it had helped her anxiety. *Id.* She indicated recent marital problems had exacerbated her anxiety attacks. *Id.* Dr. Jones observed Plaintiff to be alert and cooperative; to have normal mood and affect; and to demonstrate normal attention span and concentration. Tr. at 546. She refilled Plaintiff's prescriptions for Celexa and Vistaril. Tr. at 547.

Plaintiff complained of increased stress as a result of her divorce on June 23, 2009. Tr. at 538. She endorsed weight loss and insomnia, but denied psychomotor agitation, feelings of worthless, suicidal thoughts, and manic symptoms. *Id.* Dr. Jones observed Plaintiff to be alert and cooperative; to have normal mood and affect; and to demonstrate normal attention span and concentration. Tr. at 540. She noted Plaintiff was stable. *Id.* She discontinued Celexa and prescribed Citalopram and Vistaril. *Id.* She counseled Plaintiff to quit using marijuana and advised her that it would be difficult to treat her anxiety and depression if she continued to use it. Tr. at 541.

On September 17, 2009, Plaintiff complained of worsening anxiety, depression, and mood swings. Tr. at 534. She indicated some of her symptoms were exacerbated by her divorce. *Id.* She stated she had been taking more Vistaril than the prescribed amount because she was unable to afford to fill her prescription for Lamictal. *Id.* Dr. Jones

indicated Plaintiff had positive alarm features of depression that included insomnia and feelings of worthlessness and positive alarm features for a manic disorder that included persistently and abnormally-elevated mood, persistently and abnormally-elevated irritable mood, less need for sleep, flight of ideas, and excessive sexual indiscretions. *Id.* Dr. Jones observed that Plaintiff appeared anxious and easily distracted on examination. Tr. at 536. She enrolled Plaintiff in a prescription assistance program and provided a two-month supply of medication. *Id.*

On January 4, 2010, Plaintiff reported worsening mood, following her recent divorce. Tr. at 491. She requested an increased dose of Lamictal. *Id.* Dr. Jones observed that Plaintiff was easily distracted. Tr. at 492. She increased Plaintiff's dose of Lamictal and noted that she had not been "on therapeutic dosage." Tr. at 493. On February 3, 2010, Plaintiff reported that her mood had improved. Tr. at 488.

On March 12, 2010, Plaintiff reported that her father had recently passed away and that she was angry because he had left everything to her brothers. Tr. at 484. She indicated that she had argued with her roommate and attempted to slit her right wrist with a piece of broken porcelain, but had stopped because she thought of her son. *Id.* Dr. Jones described Plaintiff as tearful. *Id.* Plaintiff denied suicidal or homicidal thoughts. *Id.* Dr. Jones advised her to seek counseling services and treatment at the mental health clinic. Tr. at 486.

Plaintiff complained that she was experiencing anxiety attacks every couple of days on June 9, 2010. Tr. at 479. She described the attacks as involving palpitations and

chest pain. Tr. at 480. Katherine Roth, M.D. ("Dr. Roth"), indicated stress from Plaintiff's recent loss of her father was likely causing anxiety symptoms. Tr. at 483. She prescribed Buspirone. *Id.*

Plaintiff requested that her medication dosage be increased on July 19, 2010. Tr. at 475. She indicated she was moving to a shelter and was looking for work. *Id.* Dr. Jones observed Plaintiff to be alert and cooperative, but anxious. Tr. at 476. She increased Plaintiff's dose of Buspar, as requested. Tr. at 477. On August 24, 2010, Plaintiff indicated that Lamictal and Buspar had improved her mood, but that she had been unable to afford the Buspar. Tr. at 470. Dr. Jones advised Plaintiff that she could obtain Buspar from Walmart for four dollars. Tr. at 473.

On September 22, 2010, Plaintiff reported feeling stressed out and having more panic attacks. Tr. at 467. She indicated Buspar had helped, but that she continued to experience three to four attacks per day that lasted for 30 minutes to an hour at a time. *Id.* Dr. Jones discussed Plaintiff's case with a psychologist and changed her medication from Citalopram to Zoloft. Tr. at 468.

On November 1, 2010, Dr. Jones evaluated Plaintiff for anxiety and panic attacks. Tr. at 463. Plaintiff described her panic attacks as starting with chest pain and involving sweatiness, crying, redness in her face, and difficulty breathing. *Id.* She stated her panic attacks were exacerbated by being in large crowds and witnessing arguments between her roommate and the roommate's husband. *Id.* Dr. Jones observed Plaintiff to be alert and cooperative; to have normal mood and affect; and to be easily distracted. Tr. at 464. She

provided samples of Klonopin and recommended Plaintiff again attempt to obtain assistance at the mental health clinic. *Id.*

On December 1, 2010, Plaintiff presented to Spartanburg Area Mental Health for evaluation of anxiety attacks and bipolar disorder. Tr. at 730–31. She stated Klonopin was providing no relief. *Id.* Cathy D. Richardson, MSSA, LMSW, gave Plaintiff a list of local psychiatrists who might be able to assist her. Tr. at 731.

On December 13, 2010, Plaintiff showed Dr. Jones a letter from Spartanburg Area Mental Health that stated they were unable provide counseling services, but recommended she be prescribed Klonopin. Tr. at 460 and 462. Dr. Jones observed Plaintiff to be alert and cooperative; to have normal mood and affect; and to demonstrate normal attention span and concentration. Tr. at 461.

On January 27, 2011, Dr. Jones evaluated Plaintiff for headaches and dizziness. Tr. at 531. Plaintiff reported feeling depressed and anxious and indicated her mood fluctuated from feeling good to feeling very low. *Id.* She informed Dr. Jones that she thought she should apply for disability because her desire not to be around other people had prevented her from working. *Id.* Dr. Jones observed Plaintiff to be tearful during much of the interview. *Id.* She indicated Plaintiff's history of excessive sexual indiscretions were a positive alarm feature for a manic disorder. *Id.* However, she indicated the diagnosis of bipolar disorder was "overall questionable" because Plaintiff had subsequently denied many of the symptoms she initially endorsed. Tr. at 532. Dr. Jones continued Plaintiff on the same medications. *Id.*

On February 27, 2011, Plaintiff was again evaluated at Spartanburg Area Mental Health. Tr. at 514. She reported a history of bipolar disorder, anxiety, panic attacks, and crying spells. *Id.* She indicated she had been physically abused by her father as a child and molested by a male relative at the age of 12. *Id.* She reported anger issues and risk-taking behavior. *Id.* She stated she had cut herself during a manic stage because she was unable to act on her sexual desires while staying in a shelter. *Id.* Monika L. Scott, M.A. ("Ms. Scott"), described Plaintiff as cooperative; having a tearful affect and depressed mood; having normal speech; demonstrating a circumstantial thought process; having feelings of worthlessness and hopelessness; having intact memory; being easily distracted; demonstrating average intelligence; being appropriately oriented; and having poor judgment, but good insight. Tr. at 516–17. She diagnosed bipolar I disorder, alcohol abuse, cannabis abuse, borderline personality disorder, and a global assessment of functioning ("GAF")[3] score of 50.[4] Tr. at 517. She suggested Plaintiff learn coping skills to assist with her depression and anxiety and engage in therapy. Tr. at 517–18.

Plaintiff presented to Caleb Loring, IV, Psy. D. ("Dr. Loring"), for a consultative mental status examination on March 28, 2011. Tr. at 495–97. Dr. Loring described Plaintiff as pleasant and cooperative and indicated she did not appear to be promoting

---

[3] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[4] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR.*

symptoms. Tr. at 495. He stated he considered his conclusions to be a valid estimate of Plaintiff's current psychological functioning. *Id.* Plaintiff reported having an eighth grade education and a history of special education instruction.[5] *Id.* She stated she tended to lose her temper, but denied a history of legal problems. *Id.* Dr. Loring noted that Plaintiff was living in a shelter, but planned to move into an apartment with a friend. *Id.* Plaintiff stated she had crying spells and was often worried. Tr. at 496. She reported stress as a result of going through a divorce and being separated from her child. *Id.* She indicated she felt particularly anxious and depressed around the anniversary of her father's death. *Id.* Dr. Loring observed that Plaintiff had good grooming and hygiene; maintained good eye contact; was interactive; demonstrated normal speech; had a slightly nervous affect and mood; was appropriately oriented; and demonstrated no significant concentration problems. *Id.* He estimated Plaintiff's intellectual functioning was in the low-average range or higher. *Id.* He stated Plaintiff's insight and judgment appeared to be intact. *Id.* He indicated Plaintiff appeared mildly depressed, but seemed to be functioning normally while taking her medications. *Id.* He assessed bipolar disorder, NOS; adjustment disorder with disturbance of mood and anxiety; moderate/severe stressors; and a GAF score of 65.[6] Tr. at 497.

---

[5] Plaintiff's school records indicate she was enrolled in resource classes in middle school and basic mathematics and English classes in high school. Tr. at 398, 400, 402, and 407.

[6] A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *DSM-IV-TR.*

On April 13, 2011, state agency consultant Craig Horn, Ph. D. ("Dr. Horn"), completed a psychiatric review technique ("PRT"), and found that Plaintiff's mental impairments were non-severe. Tr. at 499–511. On June 16, 2011, state agency consultant Larry Clanton, Ph. D. ("Dr. Clanton"), reviewed the evidence in the file and affirmed Dr. Horn's finding that Plaintiff's mental impairments were non-severe. Tr. at 519.

Plaintiff was discharged from Spartanburg Area Mental Health on May 25, 2011, after she dropped out of services. Tr. at 513.

On August 22, 2011, Christine Nguyen-Tran, M.D. ("Dr. Nguyen-Tran"), evaluated Plaintiff for increased symptoms of anxiety, depression, and insomnia. Tr. at 525. Plaintiff reported she had been out of medication for two months. *Id.* Dr. Nguyen-Tran observed Plaintiff to be alert and cooperative; to have a normal mood and affect; and to demonstrate normal attention span and concentration. Tr. at 527. She refilled prescriptions for Klonopin, Zoloft, and Lamictal. Tr. at 527–28.

On September 22, 2011, Telicia Hughes, M.D. (Dr. Hughes"), evaluated Plaintiff for anxiety attacks. Tr. at 520. Plaintiff reported that she had been compliant with her medications. *Id.* She complained of insomnia, a four-day history of headache, and increased anxiety attacks as a result of her mother's and sister's illnesses. *Id.* Dr. Hughes observed that Plaintiff appeared very anxious, but alert and cooperative. Tr. at 522. She indicated Plaintiff's mother and sister "appear[ed] to enable her and feed off the patient's anxiety." *Id.* She refilled Klonopin, increased Sertaline to 100 milligrams, and recommended Plaintiff seek counseling. *Id.*

Plaintiff followed up with Dr. Hughes for treatment of anxiety on January 26, 2012. Tr. at 624. She reported that she had recently visited the ER and been diagnosed with fractures to her right ring finger and a vertebra in her back. *Id.* She stated she had not been taking her medications for a month because she could not afford them and had not followed up for mental health treatment. *Id.* Dr. Hughes observed Plaintiff to have a normal mood and affect with normal concentration and no focal deficits. Tr. at 627. An x-ray of Plaintiff's right hand showed a probable fracture at the base of the middle phalanx of the fourth finger. Tr. at 627. An x-ray of her back showed a possible fracture of the anterior/superior margin of the L3 vertebral body. Tr. at 628. Dr. Hughes administered a Toradol injection, prescribed Lortab and Flexeril, and refilled Plaintiff's other medications. Tr. at 628–29.

Plaintiff reported back pain and anxiety on February 27, 2012. Tr. at 616. She stated she had been wearing her back brace for three weeks, but had not followed up with a neurologist because her back pain and neuropathic symptoms had resolved. *Id.* She also denied having followed up for mental health treatment. *Id.* Dr. Hughes observed Plaintiff to appear less anxious. Tr. at 617–18. She refilled Plaintiff's medications, prescribed Tramadol for pain, and advised Plaintiff to follow-up with a mental health provider. Tr. at 618.

Plaintiff complained of constant back pain to Octavia Amaechi, M.D. ("Dr. Amaechi"), on October 31, 2012. Tr. at 725. She reported being agitated and having experienced two panic attacks that were accompanied by periods of brief syncope. *Id.* Dr.

Amaechi observed Plaintiff to have mildly limited range of motion in her back, as a result of pain, and diffuse tenderness in her low back. Tr. at 727. She described Plaintiff as appearing anxious and agitated, but not hostile. *Id.* She increased Plaintiff's dose of Zoloft, replaced Lortab with Ultracet for pain, provided information on cognitive behavioral therapy for panic attacks, and recommended low back stretches and exercises. Tr. at 728.

Plaintiff reported uncontrolled anxiety to Troy Phillips, M.D. ("Dr. Phillips), on November 16, 2012. Tr. at 722. Dr. Phillips noted that Plaintiff's dose of Zoloft had been increased at her last visit, but Plaintiff reported she had been unable to afford it and had been out of medication for two weeks. *Id.* Dr. Phillips indicated the medication could be filled at Walmart for four dollars. *Id.* He observed Plaintiff to be alert and cooperative; to have decreased mood and affect; to demonstrate normal attention span and concentration; and to have obvious anxiety and depression. Tr. at 724. He advised Plaintiff to obtain and use the increased dose of Zoloft and completed a disability form. *Id.*

Plaintiff followed up with Dr. Phillips for medication refills on January 16, 2013. Tr. at 718. She reported that she had recently sustained a fall that caused her to reinjure her back. *Id.* She indicated her bipolar symptoms were well-controlled despite the fact that she was not taking her medication. *Id.* Dr. Phillips observed Plaintiff to have minimal tenderness in her paraspinal muscles, but no focal deficits and normal sensation, reflexes, coordination, and muscle strength and tone. Tr. at 720. He restarted Zoloft 100 milligrams and refilled Plaintiff's other medications. Tr. at 720–21.

Plaintiff presented to Dr. Hughes with complaints of anxiety and depression on February 19, 2013. Tr. at 714. She complained of chest pain and indicated she was stressed and unable to afford her medication. *Id.* Plaintiff reported that she was "ok when she [was] on her meds," but was otherwise symptomatic. *Id.* Dr. Hughes noted Plaintiff was anxious and had a depressed affect. Tr. at 716. She signed Plaintiff up for the Wellvista prescription assistance program, refilled her medications, and again advised her to follow up with a mental health provider. *Id.*

On March 7, 2013, Plaintiff reported she felt more stressed after having been out of her medications for a couple of days. Tr. at 710. She indicated her sister-in-law was in the critical care unit and her cat had recently passed away. *Id.* She complained of a headache that failed to respond to ibuprofen and Tylenol PM. *Id.* Dr. Hughes observed that Plaintiff appeared anxious. Tr. at 712. She refilled prescriptions for Klonopin and Lamictal, increased Plaintiff's dose of Zoloft, and prescribed Fioricet for headaches. Tr. at 712–13.

On August 16, 2013, her mother reported that Plaintiff had been "flipping out" and throwing dishes and other items. Tr. at 735. Dr. Hughes observed Plaintiff to be alert and cooperative; to have a normal mood and affect; and to demonstrate a normal attention span and concentration. Tr. at 737. She noted Plaintiff appeared to be mildly anxious, but was not depressed or manic. *Id.* She indicated Plaintiff's bipolar disorder had deteriorated. *Id.* She prescribed Zyprexa and advised Plaintiff to follow up with a mental health provider. *Id.*

On August 30, 2013, Plaintiff complained of continued problems with mood changes and sleep problems, but indicated Zyprexa had helped with her sleep. Tr. at 771. She indicated that her aunt had been stealing her Tramadol and sleep medication. *Id.* Dr. Hughes observed that Plaintiff was alert and cooperative and had a normal attention span and concentration. Tr. at 773. She noted Plaintiff was anxious, but did not appear manic. *Id.* She increased Plaintiff's dose of Zyprexa and continued her other medications. Tr. at 773–74.

Plaintiff presented to Dr. Loring for a second consultative mental status examination on September 12, 2013. Tr. at 761–64. Dr. Loring noted that Plaintiff completed all of the appointment-related paperwork independently. Tr. at 761. He described Plaintiff as cooperative and pleasant. *Id.* He stated Plaintiff did not appear to be promoting symptoms and he considered the results of his examination to be a valid estimate of her level of functioning. *Id.* Plaintiff reported that her symptoms had worsened since the prior examination in 2011. Tr. at 762. She stated she was easily agitated; could not be around others; and experienced racing thoughts. *Id.* She indicated that she had recently stopped taking Zoloft. *Id.* Dr. Loring indicated Plaintiff appeared to be "somewhat emotionally volatile" and demonstrated "rather avoidant poor eye contact." *Id.* He noted Plaintiff appeared to be embarrassed and anxious. *Id.* He described Plaintiff as having a labile affect and alternating between being dysphoric and being anxious. *Id.* He stated Plaintiff became irritable with her mother during the interview and cried several times. *Id.* Dr. Loring indicated Plaintiff was appropriately oriented and did

not appear to be psychotic. *Id.* He noted potential problems with Plaintiff's concentration, distractibility, and memory. Tr. at 762–63. He stated Plaintiff's insight and judgment were variable, but no better than "fair." Tr. at 763. He indicated Plaintiff had a history of poor judgment and did not appear to be capable of living independently. *Id.* He estimated that Plaintiff was functioning in the borderline to low-average range of intelligence. *Id.* He assessed bipolar disorder, NOS, generalized anxiety disorder, borderline personality features, moderate/severe stressors, and a GAF score of 45. Tr. at 764.

On October 8, 2013, Plaintiff presented to Spartanburg Area Mental Health for a triage intake. Tr. at 789. She reported agitation, racing thoughts, low energy, and poor sleep. *Id.* William B. Ferrell, M.D. ("Dr. Ferrell"), indicated an initial clinical assessment was warranted because Plaintiff's treatment was not controlling her symptoms. *Id.*

Plaintiff presented to Melanie Johnson-Bailey, M.D. ("Dr. Johnson-Bailey"), for a consultative examination on October 12, 2013. Tr. at 750. She complained of chronic back pain that radiated down her right leg. *Id.* She indicated she was unable to stand, walk, or sit for long periods. *Id.* Dr. Johnson-Bailey observed that Plaintiff did not remain in one position for long and was "up and down during entire exam," but was able to get on and off the exam table without assistance. Tr. at 751. She found Plaintiff to be cooperative and pleasant and to be able to follow simple directions without difficulty. Tr. at 752. She observed Plaintiff's lumbar extension to be reduced by 10 degrees. Tr. at 753. Dr. Johnson-Bailey stated the following:'

> The claimant had functional limitations supported by objective findings in regards to back problems and history of fractured spine. ROM testing

demonstrated decreased ROM in lumbar flexion and extension. However, the remainder of a complete ortho exam was wnl.[7] The claimant's ability to stand for long periods, lift or carry >20 lbs for extended periods of time would be mildly limited.

Tr. at 752.

X-rays of Plaintiff's lumbar spine showed loss of the lordotic curvature, limbus L3 vertebra, and possible early degenerative disc disease at multiple levels on October 14, 2013. Tr. at 749.

On October 15, 2013, Dr. Johnson-Bailey indicated Plaintiff had the following abilities to do work-related physical activities: continuously lift and carry up to 10 pounds; frequently lift and carry 11–50 pounds; occasionally lift 51–100 pounds; engage in unlimited sitting; stand for two hours without interruption; walk for two hours without interruption; stand for five hours in an eight-hour workday; walk for two hours in an eight-hour workday; continuously reach, handle, finger, feel, push/pull, and operate foot controls; frequently climb, balance, stoop, kneel, crouch, and crawl; frequently be exposed to unprotected heights, operating a motor vehicle, vibrations, and moving, mechanical parts; occasionally be exposed to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat; and be exposed to moderate noise. Tr at 755–59. She stated Plaintiff could do activities like shopping; could travel without assistance; could ambulate without using a wheelchair or two canes or crutches; could walk a block at a reasonable pace on a rough or uneven surface; could use standard public transportation; could climb a few steps at a reasonable pace with the use of a single hand

---

[7] "WNL" is an abbreviation for "within normal limits."

rail; could prepare a simple meal and feed herself; could care for her personal hygiene; and could sort, handle, or use paper files. Tr. at 760.

On October 16, 2013, Plaintiff reported to Rianna Kondaveeti, D.O. ("Dr. Kondaveeti"), that she had reinjured her back when she fell from her bathtub two days earlier. Tr. at 766. She complained of numbness and constant, sharp pain that was radiating down her right leg. *Id.* Dr. Kondaveeti observed Plaintiff to have decreased muscle strength in her right lower leg as a result of pain and tenderness to palpation over her right iliac crest. Tr. at 767. She noted Plaintiff had no focal neurological deficits and normal sensation, reflexes, coordination, strength, and muscle tone in her lower extremities. *Id.* She prescribed Naprosyn and refilled prescriptions for Klonopin and Zoloft. Tr. at 767–68.

Plaintiff reported no improvement in her pain on November 7, 2013. Tr. at 776. She described the pain as sharp, constant, and shooting down her right leg. *Id.* She denied having filled her prescription for Naprosyn. *Id.* Dr. Kondaveeti again observed Plaintiff to have decreased muscle strength in her right lower leg as a result of pain and tenderness to palpation over her right iliac crest, but noted no neurological abnormalities. Tr. at 778. She prescribed Flexeril and switched Plaintiff from Zoloft to Cymbalta because Cymbalta would be covered by Wellvista. Tr. at 778–79.

Plaintiff presented to Spartanburg Area Mental Health for an initial clinical assessment on November 8, 2013. Tr. at 784. She stated she was not taking her medication because some of it had been stolen and her mother had been unable to afford

the rest. *Id.* She reported having been raped by an uncle at the age of 12. *Id.* She indicated she felt nervous in crowds; had suicidal ideation, without a plan; remained awake for several days at a time; was easily agitated; and had a history of behavior that included going on spending sprees and engaging in unprotected sex. *Id.* Katherine S. Garland, MRC ("Ms. Garland"), observed Plaintiff to be clean; to be appropriately oriented; to have an appropriate affect; to demonstrate a happy, but anxious mood; to have a normal thought process; to display fast speech and overactive motor activity; to demonstrate intact memory; to be easily distracted in her concentration and calculations; and to have a below average fund of knowledge. Tr. at 786–87. She diagnosed bipolar I disorder, cannabis abuse, chronic back pain, and a GAF score of 60[8] and recommended Plaintiff engage in counseling services. Tr. at 787–88.

Plaintiff followed up at Spartanburg Area Mental Health for a medication monitoring visit on November 18, 2013. Tr. at 781. She reported symptoms that included auditory hallucinations, depression, anxiety, and paranoia. *Id.* She tested positive for marijuana, and Ebony N. Brown, R.N. ("Ms. Brown"), advised her not to use marijuana while taking her prescribed medications. Tr. at 782.

On July 24, 2014, Plaintiff reported she had been out of her medications for six months because she had failed to reapply for Wellvista. Tr. at 804. She stated she had not kept her follow up appointments at Spartanburg Area Mental Health. *Id.* She reported that her boyfriend desired to have a child and that she was actively trying to get pregnant. *Id.*

---

[8] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.*

Dr. Kondaveeti observed Plaintiff to be alert and cooperative; to have normal mood and affect; and to demonstrate normal attention span and concentration. Tr. at 806. She advised Plaintiff to avoid pregnancy until her condition was more stable, but Plaintiff indicated that she had been trying to get pregnant for the four months she had been dating her boyfriend and would continue to try. Tr. at 807. Dr. Kondaveeti stated she would only prescribe Lamictal because Plaintiff was actively trying to get pregnant and her other medications were contraindicated during pregnancy. *Id.*

Plaintiff presented to Dr. Kondaveeti on September 4, 2014, and reported worsened panic attacks following a break up with her boyfriend. Tr. at 800. She requested that Dr. Kondaveeti prescribe all her medications since she was no longer trying to get pregnant. *Id.* Dr. Kondaveeti prescribed Lamictal, Cymbalta, Zyprexa, and Klonopin. Tr. at 801.

Plaintiff was discharged from Spartanburg Area Mental Health on September 22, 2014, for failing to attend follow up appointments. Tr. at 791.

Plaintiff complained of right foot pain after having sustained a fall on December 4, 2014. Tr. at 795. Dr. Kondaveeti observed Plaintiff to have mild tenderness to palpation on the dorsum of her right foot and ankle. Tr. at 798. She noted that Plaintiff's x-rays showed a very small fracture versus ossicle. *Id.* She advised Plaintiff to continue wearing the cast and to fill the prescription for Norco that she received in the ER. *Id.* She refilled Plaintiff's other medications. Tr. at 798–99.

C.    The Administrative Proceedings

      1.    The Administrative Hearing

            a.    Plaintiff's Testimony

                  i.    July 2, 2012

Plaintiff testified she lived with her mother. Tr. at 83. She stated she had a 13-year-old son who primarily resided with his father, but stayed with her at times. *Id.* She indicated that she had not held any particular job for longer than six months. Tr. at 84. She indicated she dropped out of school at the age of 16 and was enrolled in special education classes because of difficulty with math. Tr. at 85.

Plaintiff testified that she had discontinued mental health treatment because she had been caring for a sick friend. Tr. at 87. She indicated she had difficulty being around others and isolated in her room when she was not taking her medication. Tr. at 88. She stated she experienced daily anxiety and had difficulty being in small spaces and around a lot of people. Tr. at 88 and 89. Plaintiff indicated her mother would leave the house to allow her to calm down when she was in a bad mood, but testified that she did not shout at her mother or become physically violent. Tr. at 89–90. She endorsed daily symptoms of depression and indicated she continued to grieve her father's death and to worry about her mother's health. Tr. at 90. She indicated her moods changed rapidly. *Id.* She described periods of mania that involved pacing back and forth; being unable to sit still; and being up constantly. Tr. at 92. She stated she typically stayed in her house and refused her friends' invitations to go out. *Id.* She indicated she would frequently shake

and cry when she felt upset. Tr. at 92–93. She stated she would be unable to deal with the public in a work environment, but would follow a supervisor's instructions. Tr. at 98–99.

Plaintiff admitted that she occasionally used marijuana. Tr. at 95. She stated she had last used it during the prior month. *Id.* She stated that she slept, watched television, and sat outside during a typical day. Tr. at 96. She indicated she could make her bed, wash her clothes, prepare her meals, and clean, but stated her mother had helped her to clean because she had "been slacking on that a lot." Tr. at 96–97. She testified that her anxiety symptoms were exacerbated when she attempted to ride the bus because there were too many people on it. Tr. at 97. She admitted that she continued to use cigarettes and indicated her mother paid for them. *Id.* She indicated she had a learner's permit, but had never obtained a driver's license. Tr. at 109. She testified that she sometimes drove her mother to and from the store. *Id.*

### ii.     August 28, 2013

Plaintiff testified that she would be unable to perform a simple assembly job because she would be unable to concentrate and would have difficulty being around others. Tr. at 126. She stated she experienced anxiety and panic attacks when she was around a lot of people. *Id.*

Plaintiff indicated that she would sometimes be awake all night. Tr. at 129. She stated she would read and watch television when she was unable to sleep. *Id.* She denied current marijuana use. *Id.*

### iii. February 9, 2015

Plaintiff testified that she had consistently taken her medication since she started mental health treatment. Tr. at 152. She stated her symptoms included depressed mood, crying spells, chest pain, anxiety, and panic attacks. *Id.* She estimated that she experienced two to three panic attacks per week. *Id.* She indicated her panic attacks occurred while she was at home and in public. Tr. at 152 and 153. She stated she rarely left the house, but would visit a store with her mother "[e]very once in a while." Tr. at 153. She indicated she had a few friends, who sometimes visited her in her home. Tr. at 157–58.

Plaintiff testified that she had stopped attending mental health treatment because of her mother's illness. Tr. at 157. She stated she had cared for her mother for three to four months. Tr. at 161–62. She indicated she prepared her mother's meals, administered her medications, and helped her to bathe. Tr. at 162.

Plaintiff confirmed that she had cared for a friend for approximately a year-and-a-half, after the friend underwent gastric bypass surgery. Tr. at 162 and 164. She stated her friend's nurses had taught her how to administer nutrition through a feeding tube. Tr. at 163. She testified that she tried to keep her friend's feeding tube clean and bandaged. *Id.* She indicated she stayed with her friend at home and in the hospital and attended her medical appointments. Tr. at 162 and 163. She stated she also helped to care for her friend's teenage daughter. Tr. at 163. She indicated that one of her friend's

hospitalizations occurred because her feeding tube had become infected. *Id.* She stated she experienced panic attacks while trying to care for her friend. Tr. at 171–72.

Plaintiff denied current use of marijuana, but indicated she had used it a couple of months prior. Tr. at 159. She stated she had been smoking marijuana every other day. Tr. at 161. She indicated she could do some cooking, wash a few dishes, sweep, mop, take out the trash, clean the kitchen and living room, and do laundry in a laundromat. Tr. at 167–68. She denied attending church services, going out with friends, and shopping in stores. Tr. at 169–70. She stated she went out to eat "[e]very once in a while." Tr. at 170. She denied using the internet, having hobbies, and visiting parks, beaches, lakes, or movie theatres. Tr. at 170–71.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Jeannette Clifford reviewed the record and testified at the hearing on February 9, 2015. Tr. at 174–78. The ALJ described a hypothetical individual of Plaintiff's vocational profile who would have no exertional limitations; could never climb ladders, ropes, or scaffolds; should avoid concentrated exposure to hazards; could perform simple one or two-step tasks in a low-stress environment that did not involve production work or fast-paced work, such as an assembly line with production requirements; and could be exposed to no public contact. Tr. at 174–75. He indicated the individual would be able to tolerate frequent contact with coworkers. Tr. at 175. The VE testified that the hypothetical individual could perform work at the medium exertional level with a specific vocational preparation ("SVP") of one as a cleaner,

*Dictionary of Occupational Titles* ("*DOT*") number 919.687-014, with 282,844 positions in the national economy; a dryer attendant, *DOT* number 581.686-018, with 142,284 positions in the national economy; and production helper, *DOT* number 691.687-010, with 128,658 positions in the national economy. Tr. at 175–76.

For a second hypothetical question, the ALJ asked the VE to consider the restrictions in the first question, but to further assume the individual would be limited to lifting and carrying 50 pounds occasionally and 25 pounds frequently and could engage in frequent stooping. Tr. at 176. The ALJ asked the VE if the additional restrictions would allow the individual to perform the jobs identified in response to the prior hypothetical question. *Id.* The VE indicated they would. *Id.*

For a third hypothetical question, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as described in the second question, but to further assume that the individual would be absent from the work station at her own discretion on a daily basis and might be absent as many as three times per month. Tr. at 176–77. He asked if the individual would be able to perform any jobs. Tr. at 177. The VE responded that if an individual were to miss three days per month and more than 10 percent of a normal workday, in addition to normal breaks, she would be unable to engage in any full-time work on a sustained basis. *Id.*

Plaintiff's attorney questioned the VE about the limitation to no fast-paced production deadlines. Tr. at 177–78. The VE clarified that all three of the identified jobs

would have employer expectations, but would not be "quota based as far as paid per piece." Tr. at 178.

### 2. The ALJ's Findings

In his decision dated March 20, 2015, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant has not engaged in substantial gainful activity since December 30, 2010, the application date (20 CFR 416.971 *et seq.*).

2.   The claimant has the following severe impairments: anxiety, depression, and bipolar disorder (20 CFR 416.920(c)).

3.   The claimant also has the following non-severe impairments: back impairment, right knee impairment and allergies (20 CFR 404.1521 and 416.921).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels. However, the claimant is limited to no climbing of ladders, ropes and scaffolds and must avoid concentrated exposure to hazards. She can perform simple, one to two-step tasks, that [are] low-stress, defined as non-production work and no fast pace work such as an assembly line with production requirements, with no public contact and frequent contact with coworkers.

6.   The claimant has no past relevant work (20 CFR 416.965).

7.   The claimant was born on August 26, 1978 and was 32 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

8.   The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

9.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, since December 30, 2010, the date the application was filed (20 CFR 416.920(g)).

Tr. at 25–42.

## II. Discussion

Plaintiff alleges the ALJ erred in failing to properly evaluate opinions from the consultative psychologist and her treating physicians. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A. Legal Framework

#### 1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in

substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[9] (4) whether such impairment prevents claimant from performing PRW;[10] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[9] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[10] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345

(4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff argues the ALJ did not properly evaluate the treating and examining providers' medical opinions. [ECF No. 12 at 16]. She maintains the ALJ failed to consider their consistency. *Id.* at 31. She contends that because the ALJ rejected the treating, examining, and reviewing medical providers' opinions, it is impossible for the court to determine how he assessed her RFC. *Id.* at 31–32.

ALJs are required to carefully consider all medical opinions of record. SSR 96-5p, 1996 WL 374183 (1996). They are directed to accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 416.927(c)(2). However, if a treating source's opinion is

not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence of record, the ALJ may decline to give it controlling weight. SSR 96-2p (1996).

If a treating physician's opinion is not given controlling weight, all medical opinions of record should be evaluated and weighed based on (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 416.927(c). A medical opinion from a treating source is entitled to deference and generally carries more weight than any other opinion evidence of record, even if it is not entitled to controlling weight. 20 C.F.R. § 416.927(c)(2); *see also* SSR 96-2p. Nevertheless, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). ALJs should give more weight to medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings than to opinions that lack explanation and support in the source's records. 20 C.F.R. § 416.927(c)(3). Medical opinions that are consistent with the record as a whole are entitled

to greater weight than those that conflict with a majority of the evidence. *See* 20 C.F.R. § 416.927(c)(4); *see also Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004) ("[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it."), citing 20 C.F.R. § 416.927(d) (2004).[11] Medical opinions from specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions from physicians regarding impairments outside their areas of specialty. 20 C.F.R. § 416.927(c)(5). Finally, ALJs may consider additional factors that may be relevant to the evaluation of a particular medical opinion. 20 C.F.R. 416.927(c)(6).

The ALJ must "always give good reasons" for the weight he accords to the opinion of the claimant's treating medical source. 20 C.F.R. § 416.927(c)(2). If the ALJ issues a decision that is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." SSR 96-2p.

Nevertheless, this court should not disturb an ALJ's determination as to the weight to be assigned to a medical opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or

---

[11] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The undersigned has considered the ALJ's evaluation of medical opinions from Drs. Loring, Phillips, and Hughes in view of the foregoing authority.

### 1. Dr. Loring's Opinion

On March 28, 2011, Dr. Loring indicated that Plaintiff would do best in a job with little public contact based on her report of significant past social problems. Tr. at 497. He stated Plaintiff did not evidence any concentration or memory problems; demonstrated the ability to learn simple vocational commands; and "would most likely be able to complete these commands with adequate pace and persistence in a full-time vocational setting." *Id.*

On September 12, 2013, Dr. Loring indicated Plaintiff would likely have problems functioning completely independently and seemed to have some fairly significant mood swings and problems controlling her emotional outbursts. Tr. at 763. He stated that should Plaintiff become employed in the future, "it would be best for her to work at a job with limited public contact." *Id.* He stated Plaintiff would "most likely have a difficult time interpersonally acting with people for an extended period of time on a job." *Id.* He noted that Plaintiff appeared to have "very poor frustration tolerance" and could "potentially decompensate emotionally" if she "worked in a situation where there was stress of even a mild nature." *Id.* He stated Plaintiff demonstrated "some mild-to-moderate concentration and memory problems" that appeared to be related to her

emotionality. *Id.* He indicated "[w]hile, she might be capable of learning some simple tasks, she would most likely have a difficult time working at an adequate pace with persistence in a full-time job." *Id.* He stated Plaintiff would likely require assistance in managing funds. *Id.*

On October 16, 2013, Dr. Loring indicated that Plaintiff was likely to miss more than three days of work per month if she attempted to complete an eight-hour workday and five-day workweek. Tr. at 765. He noted Plaintiff would likely have problems with attention and concentration that would frequently interrupt tasks. *Id.* He stated Plaintiff had emotional instability associated with bipolar disorder. *Id.* He indicated his opinion was based on Plaintiff's medical history; concentration and memory problems on mental status examination; observed emotional lability during mental status examination; and reclusive behaviors. *Id.*

Plaintiff argues the ALJ rejected Dr. Loring's opinions based on a general, conclusory statement that the majority of the evidence in the record suggested she had good attention and concentration. [ECF No. 12 at 22]. She maintains the ALJ did not satisfy his duty to provide specific reasons for the weight he assigned to Dr. Loring's opinion. *Id.* at 22–23. She contends the record contains multiple abnormal findings that support Dr. Loring's opinion. *Id.* at 23. She claims the ALJ failed to consider that she experienced periods of normal behavior while cycling from mania to depression, but that her periods of mania and depression were frequent enough to be disabling. Tr. at 23–24. She maintains the ALJ exaggerated the evidence of record in finding that her activities

were inconsistent with the limitations Dr. Loring provided. *Id.* at 24–25. She argues that the inconsistencies between Dr. Loring's two opinions resulted from her change in functioning during the period between the examinations. *Id.* at 26. She contends the ALJ found internal consistencies in Dr. Loring's opinion because he considered unrelated findings. *Id.* at 26–27.

The Commissioner argues the ALJ considered the factors in 20 C.F.R. § 416.927(c) in evaluating Dr. Loring's opinions and adequately supported his findings that the March 2011 opinion was entitled to great weight, but the September and October 2013 opinions were entitled to limited weight. [ECF No. 13 at 10]. She maintains that the ALJ explained that Dr. Loring's March 2011 opinion was supported by his examination findings and consistent with the record that showed Plaintiff to have had a conservative treatment history that included no hospitalizations; periods of stability while following the recommended treatment regimen; and abilities to care for others and engage in significant ADLs. *Id.* at 10–11. She contends the ALJ reasonably gave limited weight to Dr. Loring's 2013 opinions because they were inconsistent with his prior opinion and examination findings; treatment notes from Plaintiff's primary physicians; Dr. Johnson-Bailey's observations; Plaintiff's conservative treatment history and lack of hospitalizations; and evidence of improvement with compliance and deterioration with noncompliance. *Id.* at 11–12.

Dr. Loring's opinions were not entitled to controlling weight because he was a consultative examiner, as opposed to a treating medical provider. *See* 20 C.F.R. §

416.927(c)(2). Therefore, the undersigned has considered whether substantial evidence supports the ALJ's evaluation of Dr. Loring's opinions based on the relevant factors in 20 C.F.R. § 416.927(c).

The ALJ accorded great weight to Dr. Loring's March 28, 2011 opinion. Tr. at 36. He found that it "was based on a thorough in-person examination" and was supported by Dr. Loring's observations during that examination. *Id.* He found that the opinion was "consistent with [Plaintiff's] conservative mental health treatment, her lack of any need for inpatient psychiatric admissions, and her lack of any mental health treatment since 2013." *Id.* He found the opinion to be consistent with "evidence of noncompliance with her recommended treatment regimen, and reported improvement in symptoms when compliant with same." *Id.* He noted that recent and historical records had shown Plaintiff to be alert and cooperative, to have a normal mood and affect, and to have normal attention and concentration. *Id.*, citing Exhibits 7F (Tr. at 520–614), 8F (Tr. at 615–30), 14F (Tr. at 735–44), and 24F (Tr. at 792–818). He noted that other records suggested potential concentration issues, but the "predominant evidence" suggested she had good attention and concentration. *Id.* He stated Dr. Loring's indication that "stress of even a mild nature could precipitate emotional decompensation" was refuted by Plaintiff's "ability to care for a sick friend and withstand the pressure of raising that friend[']s child in conjunction with caring for her sick mother." *Id.* He determined the March 28, 2011 opinion was consistent with Plaintiff's "significant daily activities, including her ability

to care for herself, do housework, cook, go grocery shopping, and care for her mother and friend." *Id.*

The ALJ accorded limited weight to Dr. Loring's September 12, 2013 and October 16, 2013 opinions. Tr. at 37. He noted the opinions appeared to be "entirely inconsistent with [Dr. Loring's] prior opinion." *Id.* He stated the opinions were not supported by the objective findings of Plaintiff's treating providers, which showed her to be "anxious but not manic" and to have "a normal attention span and concentration." *Id.*, citing Exhibit 21F, p. 8 (Tr. at 773). He indicated the opinions appeared to be inconsistent with Dr. Loring's examination findings that Plaintiff "had only mild to moderate attention and memory problems." *Id.* He found that the opinion regarding Plaintiff's limited public contact was supported, but that the additional limitations were inconsistent with Plaintiff's "conservative treatment, including her lack of any significant specialty care, her need for minimal emergent treatment for stabilization of symptoms, and her lack of any recent treatment." *Id.* He further stated the additional restrictions in the opinion were inconsistent with Dr. Johnson-Bailey's "notes indicating Plaintiff could follow directions without difficulty." *Id.*, citing Exhibit 18F (Tr. at 750–60). Finally, he found that the limitations were inconsistent with Plaintiff's "reported improvement in symptoms with her medication and evidence of significant noncompliance with same." *Id.*

The ALJ's summaries of Dr. Loring's findings during the March 2011 and September 2013 examinations signal his consideration of the examining factor. *See* 20 C.F.R. § 416.927(c)(1); *see also* Tr. at 31 and 32.

In evaluating the supportability factor, the ALJ noted inconsistencies between the March 2011 and September 2013 examination findings, as well as discrepancies between the restrictions he imposed in September and October 2013 and his observation that Plaintiff had only mild-to-moderate attention and concentration problems in September 2013. *See* Tr. at 37; *see also* 20 C.F.R. § 416.927(c)(3). Although Plaintiff argues that the inconsistencies between the two examinations may be explained by deterioration in her impairments between the two examinations, the ALJ concluded it was more likely the difference in her presentation resulted from her noncompliance with prescribed medications and treatment. *See id.* The ALJ's conclusion was supported by Plaintiff's indications that she was taking her medications as prescribed in March 2011 (Tr. at 496), but had stopped taking Zoloft in September 2013 (Tr. at 762). The undersigned finds unavailing Plaintiff's argument that the ALJ was comparing unrelated functions in finding the observed mild-to-moderate concentration and memory problems did not support the restrictions Dr. Loring provided. Dr. Loring's observations of mild-to-moderate concentration and memory problems were based on the results of the tests he administered. *See* Tr. at 762–63. While Dr. Loring indicated Plaintiff would likely have a difficult time working at an adequate pace with persistence in a full-time job (Tr. at 763) and would have difficulty completing a normal workday and workweek, he did not explain how these findings were supported by the objective evidence of mild-to-moderate impairment to concentration and memory. *See* 20 C.F.R. § 416.927(c)(3).

Plaintiff cites *Totten v. Califano*, 624 F.2d 10, 12 (4th Cir. 1980), to support her argument that the ALJ erred in failing to consider whether her intermittent periods of disability would have precluded work, but the ALJ adequately considered the supportability of Dr. Loring's opinions in light of the entire record. The ALJ acknowledged that Plaintiff had periods of reduced functioning, but he found that she most often functioned normally and attributed the periods of reduced functioning primarily to her noncompliance with prescribed treatment and use of marijuana. *See* Tr. at 34–35 and 37. The ALJ correctly noted that the majority of Plaintiff's treatment records showed her to have normal attention and concentration. *See* Tr. at 461, 496, 497, 527, 540, 546, 627, 724, 737, 773, and 806. The record also supports the ALJ's finding that declines in Plaintiff's functional abilities often coincided with her failure to take her prescribed medications. *See* Tr. at 525, 624, 710, 714, 718, 722, 771, 784, 800, and 804.

Although Plaintiff claims that the ALJ should not have considered her noncompliance because it was caused by her inability to afford her medications, a review of the ALJ's decision reveals that the ALJ considered and provided valid reasons for rejecting Plaintiff's argument. *See* Tr. at 35 ("Although I acknowledge testimony suggesting the claimant cannot afford adequate medical care, there is no evidence to demonstrate the [sic] she has consistently sought help through the multitude of channels available for indigent individuals, such as those offered by charities.[12] Moreover, the

---

[12] In fact, the record shows that Plaintiff had been enrolled in a prescription charity program, but went without medication for six months because she neglected to reapply for assistance. *See* Tr. at 804.

claimant spends money on cigarettes and illicit substances, which could be better allocated toward her prescription medications and treatment.").

Plaintiff also maintains that the ALJ incorrectly considered her treatment to be conservative in evaluating Dr. Loring's opinion and asserts that prescribed psychotropic medication is an appropriate course of treatment for bipolar disorder. [ECF No. 12 at 27]. However, the ALJ did not dispute that Plaintiff received the appropriate course of treatment. He merely observed that the absence of frequent specialty care and emergent treatment for stabilization failed to support the extreme limitations Dr. Loring suggested.

Although Plaintiff argues the ALJ essentially misrepresented the evidence regarding her activities to find they were inconsistent with Dr. Loring's 2013 opinion, the undersigned disagrees. The ALJ cited Plaintiff's abilities to care for her mother and friend while they were ill, to care for her friend's daughter, to do housework, to prepare meals, and to go grocery shopping. Tr. at 36. While Plaintiff argues that the ALJ ignored her testimony that she experienced symptoms and had some difficulty engaging in some these activities, the fact remains that she was able to complete them for extended periods. *See* Tr. at 162 and 164 (noting that Plaintiff's friend's feeding tube had become infected and that she had experienced panic attacks while caring for her friend, but indicating she had cared for the friend for a year-and-a-half), Tr. at 161–62 (testifying that she had cared for her mother for three to four months and had prepared her meals, administered her medications, and helped her to bathe during that time), and Tr. at 167–68 (indicating the

ability to do some cooking, wash a few dishes, sweep, mop, take out the trash, clean the kitchen and living room, and clean laundry in a laundromat).

In light of the foregoing, the undersigned recommends the court find that the ALJ cited substantial evidence to support his decision to give great weight to Dr. Loring's March 2011 opinion and limited weight to his September and October 2013 opinions.

### 2. Dr. Phillips's Opinion

On November 16, 2012, Dr. Phillips indicated in a questionnaire that Plaintiff would likely miss more than three days of work per month if she attempted to complete an eight-hour workday and five-day workweek. Tr. at 709. He stated Plaintiff's problems with attention and concentration would frequently interrupt her ability to complete tasks. *Id.* He indicated Plaintiff's limitations resulted from bipolar disorder with severe anxiety and had likely limited her ability to work since February 28, 2008. *Id.*

Plaintiff argues the ALJ erred in giving little weight to Dr. Phillips's opinion. [ECF No. 12 at 29]. She maintains that she followed the proper course of treatment for her impairments by using psychotropic medications. *Id.* She contends the ALJ misconstrued the evidence regarding her ability to care for others and cherry-picked the record to find evidence of normal concentration without reconciling evidence of abnormal concentration. *Id.*

The Commissioner argues the ALJ appropriately discredited Dr. Phillips's opinion because it was contradicted by his treatment notes from the same day that showed Plaintiff to have normal attention and concentration. [ECF No. 13 at 13]. She maintains

the ALJ further supported his decision to accord little weight to Dr. Phillips's opinion based on Plaintiff's conservative treatment history, her documented noncompliance, evidence of improved symptoms during periods of compliance, and her admitted activities. *Id.*

The ALJ recognized that Dr. Phillips was a treating provider. *See* Tr. at 36; *see also* 20 C.F.R. § 416.927(c)(2). However, he declined to give Dr. Phillips's opinion controlling weight because it was not well-supported by medically-acceptable clinical and laboratory diagnostic techniques and was inconsistent with the other substantial evidence of record. *See* 20 C.F.R. § 416.927(c)(2). He considered the additional relevant factors in 20 C.F.R. § 416.927(c) and determined Dr. Phillips's opinion was entitled to little weight. *See* Tr. at 36.

The ALJ noted that Dr. Phillips failed to cite any evidence to corroborate his opinion. *See id.* In considering the supportability of Dr. Phillips's opinion in his treatment notes, the ALJ noted that Dr. Phillips's opinion was inconsistent with his observation that Plaintiff had normal attention and concentration on the same day he rendered his opinion. *See* Tr. at 37; *see also* 20 C.F.R. § 416.927(c)(3). He also noted the inconsistency between Dr. Phillips's opinion and Plaintiff's report at the next visit that her bipolar symptoms were well-controlled despite the fact that she was not taking her medication. *See id.* The ALJ's evaluation of the supportability factor is reinforced by a record that shows Plaintiff to have been examined by Dr. Phillips on only two occasions and

indicates Dr. Phillips's findings to be consistent with the ALJ's recitation of the evidence. *See* Tr. at 718 and 722–24.

In evaluating the consistency of Dr. Phillips's opinion with the evidence as a whole, the ALJ noted that the opinion directly conflicted with Plaintiff's "ability to improve on medications if she is compliant with same, her conservative mental health treatment, which was also sporadic in nature, and her lack of any recent mental health treatment. Tr. at 36. This was particularly relevant in light of Plaintiff's indications that she was not taking all of her prescribed medications during either of her visits with Dr. Phillips. *See* Tr. at 718 and 722. It was also supported by evidence of record, as detailed above. The ALJ stated Plaintiff's abilities to provide care for her friend for two years and for her mother for several months suggested she would not miss work more than three times per month. Tr. at 37. While Plaintiff argues that she testified that she had problems while caring for her friend, the ALJ's interpretation of the evidence was reasonable in light of Plaintiff's testimony regarding the length of time that she cared for her friend. Furthermore, Plaintiff did not testify that she experienced any significant symptoms that affected her ability to care for her mother. *See* Tr. at 162.

In light of the foregoing, the undersigned recommends the court find that the ALJ provided a specific explanation to support his decision to accord little weight to Dr. Phillips's opinion and that substantial evidence supports his weighing of the relevant factors in 20 C.F.R. § 416.927(c).

### 3.    Dr. Hughes's Opinion

On September 26, 2013, Dr. Hughes indicated in a questionnaire that Plaintiff would likely miss more than three days of work per month if she attempted to complete an eight-hour workday and five-day workweek. Tr. at 748. She further indicated that Plaintiff's problems with attention and concentration would frequently interrupt tasks during the workday. *Id.* She indicated Plaintiff's limitations resulted from bipolar disorder, anxiety, and a history of drug abuse and explained that Plaintiff had "uncontrolled bipolar/anxiety in spite of meds." *Id.*

Plaintiff maintains the ALJ erred in rejecting Dr. Hughes's opinion for the same reasons that he erred in rejecting Dr. Phillips's opinion. The Commissioner maintains that the ALJ appropriately gave little weight to Dr. Hughes's opinion because the record established that Plaintiff's symptoms were adequately controlled with medication and generally reflected her normal mood and affect with normal attention and concentration during periods of compliance. [ECF No. 13 at 13–14].

Although the ALJ recognized that Dr. Hughes was a treating physician (Tr. at 37), he declined to accord controlling weight to her opinion because it was not well-supported by medically-acceptable clinical and laboratory diagnostic techniques and was inconsistent with the other substantial evidence of record. *See* 20 C.F.R. § 416.927(c)(2). He determined that Dr. Hughes's opinion was entitled to only limited weight. *See* Tr. at 37.

The ALJ found that Dr. Hughes's opinion conflicted with mental status examinations that showed Plaintiff to have normal mood and affect and normal attention and concentration. *See id.* The ALJ's interpretation of Dr. Hughes's findings is largely supported by Dr. Hughes's treatment notes. *See* Tr. at 520 (describing Plaintiff as alert and cooperative), Tr. at 618 (stating Plaintiff was less anxious and indicating no psychiatric abnormalities), Tr. at 624 (noting Plaintiff had normal mood and affect with normal concentration and no focal deficits), Tr. at 737 (indicating Plaintiff was alert and cooperative, had a normal mood and affect, and demonstrated normal attention span and concentration), and Tr. at 773 (observing Plaintiff to be alert and cooperative, to have normal attention span and concentration, and to be anxious, but not manic). Although Dr. Hughes indicated Plaintiff was anxious during several visits, the periods of increased anxiety often coincided with noncompliance with prescribed medications, which the ALJ observed to be an exacerbating factor throughout his decision. *See* Tr. at 712 and 714.

The ALJ weighed the consistency of Dr. Hughes's opinion and found it to be inconsistent with the other evidence of record. *See* Tr. at 37; *see also* 20 C.F.R. § 416.927(c)(4). He noted Plaintiff's "own admissions that when she takes her medications, her symptoms are controlled." *See id.* In fact, Plaintiff informed Dr. Hughes that she was "ok" when taking her medications, but was "otherwise . . . symptomatic." *See* Tr. at 714. As with Dr. Loring's and Dr. Phillips's opinions, the ALJ determined the restrictions Dr. Hughes indicated were inconsistent with Plaintiff's ADLs, "which include her ability to

care for herself independently, care for her mother when she was ill, care for her friend when she was ill, and perform house hold [sic] responsibilities." *Id.*

In light of the foregoing explanation, the undersigned recommends the court find that substantial evidence supports the ALJ's decision to give limited weight to Dr. Hughes's opinion.

The undersigned further recommends the court reject Plaintiff's argument that the ALJ did not consider the consistency of the opinions from Drs. Loring, Phillips, and Hughes. The ALJ thoroughly considered that each found that Plaintiff would be incapable of completing an eight-hour workday and five-day workweek. *See* Tr. at 36– 37. However, he determined that their findings were inconsistent with a record that showed Plaintiff to be capable of engaging in significant activities and generally maintaining normal mental status while compliant with her prescribed medications. Therefore, even though the three medical providers' opinions were consistent with each other, substantial evidence supports the ALJ's decision to give them limited weight.

To the extent that Plaintiff argues the ALJ's decision is supported by no medical opinion evidence, the undersigned disagrees. While the ALJ did not give controlling weight to any one medical opinion, he gave great weight to Dr. Loring's March 2011 opinion (Tr. at 36); credited Dr. Loring's September 2013 opinion that Plaintiff should have limited public contact (Tr. at 37); and accorded great weight to Dr. Johnson-Bailey's assessment of Plaintiff's abilities to lift, carry, sit, manipulate, push, and pull

(Tr. at 37–38). Therefore, Plaintiff's argument that the ALJ credited no medical opinions in assessing her RFC is without merit.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

August 3, 2017
Charleston, South Carolina